FILED

2022 Mar-08  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **VICTOR AVERY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:   4:20-cv-01108-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Victor Avery seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).   The Commissioner denied Mr. Avery's application for Supplemental Security Income. Mr. Avery argues that the Administrative Law Judge – the ALJ – erred for two reasons:  the ALJ excluded tuberculosis from Mr. Avery's list of impairments, and the ALJ's determination of Mr. Avery's residual function capacity or RFC is not

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

supported by substantial evidence.  Having reviewed the administrative record, for the reasons discussed below, the Court reverses the Commissioner's decision.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To be eligible for Supplemental Security Income under Title XVI of the Social Security Act, a claimant must be disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months."  42 U.S.C. § 423(d)(1)(A).[2]

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[2] "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited February 22, 2022).

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Avery applied for SSI on November 28, 2017, alleging that he was unable to work due to back pain and difficulty breathing that began in August 2017. The Commissioner initially denied Mr. Avery's claim on February 21, 2018. (Doc. 9-5, pp. 2-6). Mr. Avery requested a hearing before an ALJ. (Doc. 9-3, p. 24). The ALJ issued an unfavorable decision on September 19, 2019. (Doc. 9-3, p. 8). On October 3, 2019, Mr. Avery filed exceptions to the ALJ's decision with the Appeals Council. (Doc. 9-3, pp. 69-70). The Appeals Council denied Mr. Avery's request for review (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

*Mr. Avery's Medical Records*

To support his SSI application, Mr. Avery submitted medical records dating to 2010. On April 15, 2010, Mr. Avery visited Quality of Life Health Services for

chest discomfort.  (Doc. 9-8, p. 6).  He was 48 years old; his date of birth is June 9, 1961.  (Doc. 9-8, p. 28).  Mr. Avery reported that his symptoms had begun two weeks earlier.  Mr. Avery stated that he had a dry, hacking, non-productive cough.  (Doc. 9-8, p. 6).  Phillip Rogers, the CRNP who evaluated Mr. Avery, noted that Mr. Avery's chest was symmetric, his lungs were clear, his chest wall was tender, and his respiratory effort was normal.  (Doc. 9-8, p. 7).  Nurse Rogers indicated that Mr. Avery had pleurisy or TB and directed Mr. Avery to take Motrin and Tessalon Perle. The nurse instructed Mr. Avery to return to the clinic if his condition worsened. (Doc. 9-8, p. 7).

On August 31, 2010, Mr. Avery visited Quality of Life complaining of a persistent cough that had lasted for three weeks.  (Doc. 9-8, p. 8).  Mr. Avery stated that nothing relieved his cough and that lying down made the cough worse.  (Doc. 9-8, p. 8).  Mr. Avery reported that he smoked a quarter pack of cigarettes each day, and he had smoked for 25 years.  (Doc. 9-8, p. 8).  He also reported that his symptoms began with a feeling that he had to burp, but he vomited and continued to feel a burning sensation in his chest and stomach.  (Doc. 9-8, pp. 8-9).  Nurse Rogers noted that Mr. Avery showed symptoms of gastroesophageal reflux disease – GERD – and directed him to take Ranitidine Hcl twice a day to treat his reflux.  Nurse Rogers told Mr. Avery to avoid eating tomatoes, peppers, onions, peppermint, and chocolate.

(Doc. 9-8, pp. 8-10). Nurse Rogers instructed Mr. Avery to return for a follow up visit in two months. (Doc. 9-8, p. 10).

On October 28, 2010, Mr. Avery returned to Quality of Life. (Doc. 9-8, p. 11). He reported daily throat pain and heartburn. (Doc. 9-8, p. 11). Mr. Avery also complained of lower back pain and stated that daily activities and standing aggravated his pain. (Doc. 9-8, p. 11). Mr. Avery's physical exam revealed lumbar spine tenderness. (Doc. 9-8, p. 12). Mr. Avery received a prescription for Ibuprofen and Ranitidine Hcl. (Doc. 9-8, p. 13).

Mr. Avery visited Quality of Life on December 27, 2010. (Doc. 9-8, p. 14). Mr. Avery complained of back pain, left knee pain, and hypertension. (Doc. 9-8, p. 14). Mr. Avery reported that his back pain felt achy and dull, occurred intermittently, and was more intense when he was changing positions, standing, and walking. He reported that pain medication provided relief. (Doc. 9-8, p. 14). Nurse Rogers noted that Mr. Avery's hypertension was becoming worse. (Doc. 9-8, p. 14). He told Mr. Avery to continue taking Ranitidine Hcl and Ibuprofen and added Norvasc to treat hypertension. (Doc. 9-8, p.16). Mr. Avery scheduled a three-month follow-up visit. (Doc. 9-8, p.16).

On March 25, 2011, Mr. Avery visited Quality of Life for hypertension and pain in his lower back, knee, and ankle. (Doc. 9-8, p. 17). Mr. Avery's hypertension was stable, and he had no associated symptoms. (Doc. 9-8, p. 17). He did not have

a cough or wheezing, and his lungs were clear.  (Doc. 9-8, pp. 17-18).  Mr. Avery complained of persistent stiff, tender, achy pain aggravated by standing, walking, and weather.  (Doc. 9-8, p. 17).  Mr. Avery had no abnormalities in his back or spine, but Mr. Avery's spine and knees were tender.  (Doc. 9-8, p. 18).

On June 8, 2011, Mr. Avery visited Quality of Life with complaints of weight loss, cough, and dizziness.  (Doc. 9-8, p. 20).  According to treatment notes, Mr. Avery had lost 101 pounds because of chronic illness and uncontrolled diabetes. (Doc. 9-8, p. 20).  Mr. Avery's risk factors included alcohol abuse and diabetes. (Doc. 9-8, p. 20).  Mr. Avery reported a dry, hacking, non-productive, persistent cough.  (Doc. 9-8, p. 20).  Nurse Rogers noted that Mr. Avery's dizziness could be associated with positional hypotension and discontinued his Norvasc.  (Doc. 9-8, pp. 20, 22).  Mr. Avery's lungs were clear.  (Doc. 9-8, p. 22).  Nurse Rogers noted that Mr. Avery had chronic fatigue.  (Doc. 9-8, p. 22).

Mr. Avery was hospitalized at Riverview Regional Medical Center between June 26 and July 5, 2011 for pneumonia and tuberculosis.  (Doc. 9-9, pp. 56-128, 134).  His weight, blood pressure, and oxygen were low at 94.5 pounds, 112/68, and $SpO_2$ at 89%, respectively.  (Doc. 9-9, p. 161).  Mr. Avery was using a cane, but he was independent in activities of daily living.  (Doc. 9-9, p. 134).  He reported that he had stopped smoking two to three years earlier.  (Doc. 9-9, p. 162).  He reported

a prior surgery for a cracked disc in his back. (Doc. 9-9, p. 163).[3] Mr. Avery was positive for coughing and shortness of breath, and his tuberculosis screening revealed an abnormal chest x-ray, malnourishment, a productive cough, fever, and fatigue. (Doc. 9-9, p. 163). Mr. Avery's TB screening showed that he had no history of TB. (Doc. 9-9, p. 163). Throughout his hospitalization, Mr. Avery received medications, aerosol therapy, and oxygen therapy several times a day. (Doc. 9-9, pp. 139-152). At discharge, Mr. Avery was prescribed Myambutol 400mg, Isoniazid 300mg, Pyrazinamide 500mg, Rifadin 300mg, Propranolol 20mg, and Vitamin B-6 50mg. (Doc. 9-9, pp. 112-13). Mr. Avery was instructed to follow up with the Health Department for TB therapy. (Doc. 9-9, p. 17).

On September 27, 2011, Mr. Avery visited Quality of Life to have paperwork completed for disability and food assistance. (Doc. 9-8, p. 24). Mr. Avery complained of fatigue and shortness of breath. (Doc. 9-8, p. 24). He weighed 95.2 pounds; he was 5'2". (Doc. 9-8, p. 26). Mr. Avery was wheezing. (Doc. 9-8, p. 26).

On November 14, 2011, Mr. Avery visited Quality of Life with complaints of back pain following a fall. (Doc. 9-8, p. 28). Mr. Avery reported pain in his lower back, legs, and thighs that was achy and dull. (Doc. 9-8, p. 28). He rated his pain 8/10. (Doc. 9-8, p. 29). He explained that his symptoms were aggravated by

---

[3] A Quality of Life record indicates that Mr. Avery had the surgery in 1979. (Doc. 9-8, p. 24).

"bending, changing positions, standing and walking." (Doc. 9-9, p. 28). Mr. Avery said that nothing relieved the pain. (Doc. 9-9, p. 28). He had gained 10 pounds. (Doc. 9-8, p. 29). His record states: "Overall appearance is older than stated age." (Doc. 9-8, p. 29). Mr. Avery was not taking blood pressure medication. (Doc. 9-8, p. 30).

Mr. Avery visited Quality of Life for a follow up appointment on January 30, 2012. (Doc. 9-8, p. 31). Mr. Avery reported that he still had back pain, rated his pain as 7/10, and requested refills of his medication. (Doc. 9-8, pp. 31-32). The treatment notes reflect that Mr. Avery had a history of alcoholic gastritis, and he had been hospitalized for two days earlier in the month for vomiting. (Doc. 9-8, p. 31). He weighed 115.6 pounds. (Doc. 9-8, p. 32). Nurse Rogers continued Mr. Avery's mediation, added Omeprazole to treat his gastrointestinal issues, and instructed him not to drink alcohol. (Doc. 9-8, p. 33).

Three months later, on April 30, 2012, Mr. Avery returned to Quality of Life for a follow-up visit. (Doc. 9-8, p. 35). Mr. Avery complained of occasional back pain and stiffness. (Doc. 9-8, p. 35). Mr. Avery reported that he had radiating pain in his lower back and legs. (Doc. 9-8, p. 35). He stated that his symptoms were aggravated by daily activities and relieved by pain medication. (Doc. 9-8, p. 35). Mr. Avery received a prescription for Mobic 15mg to relieve the stiffness in his back. (Doc. 9-8, p. 38). According to the treatment notes, Mr. Avery had a history

of TB that was being treated by the Etowah County Health Department.  (Doc. 9-8, p. 35).

Mr. Avery had a three-month follow-up appointment on July 30, 2012.  (Doc. 8-9, p. 39).  Mr. Avery complained of back pain that radiated to his left thigh.  (Doc. 8-9, p. 39).  Mr. Avery described the pain as achy and dull.  (Doc. 8-9, p. 39).  He reported that his symptoms were aggravated by bending and walking and relieved by pain medication.  (Doc. 8-9, p. 39).  Mr. Avery reported that he had completed his TB medication and that he would have sputum cultures every three months for the following year.  (Doc. 8-9, p. 39).

On October 30, 2012, Mr. Avery visited Quality of Life for a three-month follow-up appointment.  (Doc. 9-8, p. 43).  Mr. Avery reported that he still had pain in this lower back and legs and that he had a cough.  (Doc. 9-8, p. 43).  Mr. Avery reported that his back pain radiated to his left calf and left thigh.  (Doc. 9-8, p. 43). He explained that his symptoms were aggravated by changing positions and daily activities and were relieved by pain medication.  (Doc. 9-8, p. 43).  The treatment notes reflect that Mr. Avery complained of a non-productive cough, nasal congestion, postnasal drainage, rhinitis, sinus pressure, and sore throat.  (Doc. 9-8, p. 43).  Mr. Avery was instructed to take Mucinex DM for cough and congestion. (Doc. 9-8, p. 46).  Mr. Avery reported that he had had two negative sputum cultures

at the Health Department, and he was scheduled for two more cultures. (Doc. 9-8, p. 44).

On January 20, 2013, Mr. Avery saw Nurse Rogers at Quality of Life. Mr. Avery reported low back pain with some relief from his pain medications. (Doc. 9-8, p. 47). He was taking his medication as directed. (Doc. 9-8, p. 47).[4]

On September 3, 2013, Mr. Avery sought treatment at Quality of Life for back pain. (Doc. 9-8, p. 50). According to the treatment notes, Mr. Avery had been treated at the ER a few days before. (Doc. 9-8, p. 53). He was given Prednisone and Flexeril for pain. Mr. Avery had mild back spasms. (Doc. 9-8, p. 52). Nurse Rogers renewed Mr. Avery's pain medication prescriptions. (Doc. 9-8 p. 53).

Mr. Avery had a follow-up visit at Quality of Life on December 3, 2013. (Doc. 9-8, p. 54). Mr. Avery's back pain was unchanged. Mr. Avery's prescriptions were renewed. (Doc. 9-8, p. 57).

Mr. Avery returned to Quality of Life on March 3, 2014 and reported relief of his lower back pain and requested refills of his medications. (Doc. 9-8, p. 58). Nurse Rogers noted that Mr. Avery's hypertension was stable, renewed his prescription for Mobic and Flexeril, and scheduled him for a three-month follow-up. (Doc. 9-8, pp.

---

[4] Mr. Avery reported that he had had a disability hearing, and he was awaiting results. (Doc. 9-8, p. 47).

58-61).  Mr. Avery had a normal range of motion with no pain on examination. (Doc. 9-8, p. 60).

On September 22, 2014, Mr. Avery described persistent pain in his upper back, middle back, and neck, aggravated by sitting and standing.  (Doc. 9-8, p. 62). Mr. Avery regarded his activity level as moderate; his exercise included walking. (Doc. 9-8, p. 63).  Nurse Rogers prescribed Mr. Avery one 10mg tablet of Baclofen twice daily and one 300mg capsule of Gabapentin twice daily.  (Doc. 9-8, p. 63). Nurse Rogers asked Mr. Avery to continue taking Flexeril, Mobic, and Norvasc. (Doc. 9-8, p. 67).

On October 22, 2014, Mr. Avery saw Dr. Muhammad Tariq at Quality of Life. Dr. Tariq noted that Mr. Avery did not fill his most recent prescriptions because "he could not afford them."  (Doc. 9-8 p. 68).  Mr. Avery's hypertension was getting worse.  Dr. Tariq instructed Mr. Avery to continue Norvasc as directed.  (Doc. 9-8, p. 71).

Mr. Avery visited Quality of Life on July 29, 2015.  Mr. Avery indicated that nothing relieved his back pain. (Doc. 9-8, p. 72).  He had moderate pain with motion. (Doc. 9-8, p. 76).  He reported that he had not been taking prescribed medications because he could not afford them.  (Doc. 9-8, p. 72).  Nurse Rogers prescribed Cyclobenzaprine for Mr. Avery's back pain and Hydrochlorothiazide for his hypertension.  (Doc. 9-8, p. 74).  Mr. Avery was smoking again, using ¼ pack of

cigarettes per day.  (Doc. 9-8, p. 73).  Mr. Avery was counseled to stop smoking. (Doc. 9-8, p. 74).

Mr. Avery had a follow-up appointment at Quality of Life for hypertension and back pain on September 28, 2015.  (Doc. 9-8, p. 77).  Mr. Avery's hypertension was stable.  He reported he was "not taking the Hydrochlorothiazide to control his blood pressure."  (Doc. 9-8, p. 77).  Mr. Avery complained that his back pain was radiating "to [his] left hip and leg almost all the time."  (Doc. 9-8, p. 77).  He rated his pain 8/10.  (Doc. 9-8, p. 80).  Nurse Rogers renewed Mr. Avery's prescriptions for Hydrochlorothiazide and Cyclobenzaprine.  (Doc. 9-8, p. 81).

Mr. Avery had back imaging the following day on orders from Nurse Rogers. (Doc. 9-8, p. 137).  The results of the imaging are difficult to read, but there was an observation concerning disc space.  (Doc. 9-8, p. 137).  A medical record from 2018 indicates that Mr. Avery's 2015 back x-rays indicated chronic disc disease at L4/L5. (Doc 9-8, p. 147).

Mr. Avery had a follow-up appointment on December 18, 2015.  (Doc. 9-8, p. 82).  Mr. Avery's hypertension was stable, but he reported pain in his lower back. (Doc. 9-8, p. 82).  He was told to continue his medication for hypertension and back pain.  (Doc. 9-8, p. 86).  He was smoking 10 cigarettes per day.  (Doc. 9-8, p. 83).

Treatment notes from Quality of Life reflect that on April 29, 2016, Mr. Avery's hypertension was stable, and he experienced no associated symptoms.

(Doc. 9-8, p. 87).  Mr. Avery reported that his back pain was persistent and that it was aggravated by changing positions, daily activities, and extension and flexion. (Doc. 9-8, p. 87).  Mr. Avery reported that he had been taking Cyclobenzaprine for his spasms.  (Doc. 9-8, p. 87).  He reported a cough.  (Doc. 9-8, p. 87).

On June 7, 2016, Mr. Avery visited Quality of Life for back pain and urinary symptoms.  (Doc. 9-8, p. 92).  Mr. Avery complained that he continued to experience the same symptoms that were associated with his lower back pain as he had before. (Doc. 9-8, p. 92).  He reported that his symptoms were relieved by pain medication and rest.  (Doc. 9-8, p. 92).  Mr. Avery also reported that he was taking Flexeril to relieve his pain.  (Doc. 9-8, p. 92).

Mr. Avery visited Quality of Life on September 7, 2016.  (Doc. 9-8, p. 98). He presented with back pain, cough, and hypertension.  (Doc. 9-8, p. 98).  Mr. Avery described his back pain as he had in previous appointments.  (Doc. 9-8, p. 98).  He was experiencing muscle spasms in his lumbar spine, and he rated his pain as 8/10. (Doc. 9-8, pp. 103-04).  He described his cough as persistent and non-productive. (Doc. 9-8, p. 98).  Mr. Avery explained that nothing relieved his cough.  (Doc. 9-8, p. 98).  Nurse Rogers noted that Mr. Avery had been cleared of TB by the health department and had no active disease.  (Doc. 9-8, pp. 98, 104).  Nurse Rogers prescribed Tessalon Perles to treat Mr. Avery's cough.  (Doc. 9-8, p. 105).

Mr. Avery returned to Quality of Life within one week for treatment for abnormal liver functions.  (Doc. 9-8, p. 106).  Nurse Rogers strongly encouraged Mr. Avery to stop drinking alcohol.  (Doc. 9-8, p. 110).

Mr. Avery went to Quality of Life for hypertension, depression, and back pain on December 7, 2016.  (Doc. 9-8, pp. 111).  Mr. Avery's back pain was stable; he reported symptoms as he had before.  (Doc. 9-8, pp. 111).  He indicated that his symptoms were relieved by physical therapy and that Flexeril gave him "good results."  (Doc. 9-8, p. 111).  He rated his pain as 8/10.  (Doc. 9-8, p. 116).  Mr. Avery attributed his depression to his chronic low back pain.  (Doc. 9-8, p. 111).  His depression was scored as severe.  (Doc. 9-8, pp. 113, 117; *see also* Doc. 9-8, p. 116).  He had been turned down for disability.  (Doc. 9-8, p. 111).

Mr. Avery visited Quality of Life on June 2 and August 15, 2017 for back pain.  (Doc. 9-8, pp. 119, 125).  According to the treatment notes, Mr. Avery had no change in symptomology of his back pain.  (Doc. 9-8, pp. 119, 125).  He continued to report good results with Flexeril.  (Doc. 9-8, pp. 119, 125).  He was negative for depression.  (Doc. 9-8, p. 122).  In June, Nurse Rogers encouraged Mr. Avery to exercise.  (Doc. 9-8, p. 123).  In August, Mr. Avery reported that he was walking and cycling, exercising 10-15 hours per week.  (Doc. 9-8, p. 126).  Mr. Avery visited Quality of Life on November 8, 2017 for a blood pressure check-up.  (Doc. 9-8, p. 131).  His low back pain was unchanged.  (Doc. 9-8, pp. 134-35).

Mr. Avery returned to Quality of Life on February 12, 2018 for hypertension and back pain. (Doc. 9-8, p. 147). Mr. Avery reported that he had been turned down for disability again, and he requested a letter stating that "he is not able to work because of his back pain." (Doc. 9-8, p. 147). Nurse Rogers wrote that Mr. Avery's back pain was aggravated by daily activities but relieved by pain medication, and his hypertension was stable with no symptoms. (Doc, 9-8, p. 147). Nurse Rogers noted that Mr. Avery's daily activities included walking and cycling 10 to 15 hours per week. (Doc. 9-8, p. 148). Nurse Rogers prescribed Mr. Avery Ibuprofen and renewed his prescriptions for Hydrochlorothiazide and Cyclobenzaprine. (Doc. 9-8, p. 150). Mr. Avery reported that his pain was an 8/10. (Doc. 9-8, p. 151).

Mr. Avery reported for x-rays of his spine on February 14, 2018. (Doc. 9-8, p. 191). The imaging revealed a disc collapse at L5 and osteopenia, but there were no acute findings. (Doc. 9-8, pp. 153, 191).[5]

On March 5, 2018, Mr. Avery visited Quality of Life. (Doc. 9-8, p. 153). He complained of persistent lower back pain. (Doc. 9-8, p. 153). Mr. Avery described his pain as achy and dull. (Doc. 9-8, p. 153). He reported that his symptoms were aggravated by changing positions, daily activities, standing and walking. (Doc. 9-8,

_____

[5] Osteopenia is low bone mineral density. https://my.clevelandclinic.org/health/diseases/21855-osteopenia (last visited March 4, 2022).

p. 153).  Mr. Avery indicated his pain was relieved by pain medication.  (Doc. 9-8, p. 153).  He reported his pain as 10/10.  (Doc. 9-8, p. 157).

Mr. Avery visited Quality of Life on June 5, 2018 with complaints of hypertension and back pain.  (Doc. 9-8, p. 159).  He rated his pain as 8/10.  (Doc. 9-8, pp. 164, 166).  His hypertension was stable.  (Doc. 9-8, p. 166).

On November 5, 2018, Mr. Avery visited Quality of Life for hypertension, cold symptoms, and back pain.  (Doc. 9-8, p. 168).  His hypertension was stable.  (Doc. 9-8, p. 168).  He reported that he had a non-productive, persistent cough that had started a week before.  (Doc. 9-8, p. 168).  He indicated that nothing relieved the cough.  (Doc. 9-8, p. 168).  His back pain was unchanged.  (Doc. 9-8, pp. 168, 172).

On February 11, 2019, Mr. Avery went to Quality of Life with complaints of hypertension and a cough.  (Doc. 9-8, p. 176).  Mr. Avery's hypertension was stable.  (Doc. 9-8, p. 176).  He rated his back pain as 9/10.  (Doc. 9-8, p. 181).  Mr. Avery described his cough as productive and persistent.  He explained that the cough had gradually gotten worse.  (Doc. 9-8, p. 176).  Mr. Avery also had symptoms of wheezing, hoarseness, and sore throat.  (Doc. 9-8, p. 176).  According to treatment notes, Mr. Avery had recently been admitted to the hospital for bronchitis and was prescribed an Albuterol inhaler.  (Doc. 9-8, p. 176).

On May 9, 2019, Mr. Avery had a follow-up appointment for hypertension and back pain. (Doc. 9-8, p. 184). Mr. Avery reported that the pain in his back was improving, but he still rated his pain as 9/10. (Doc. 9-8, pp. 184, 186). He explained that the pain occurred occasionally in his lower back, and it was relieved by medication. (Doc. 9-8, p. 184).

*Etowah County Health Department Records*

After his hospitalization for TB, Mr. Avery received treatment at the Etowah County Health Department from July 6, 2011 through July 16, 2012. (Doc. 9-9, pp. 22-33). Staff from the health department either visited his home, or Mr. Avery visited the health department twice a week for an assessment and medication. (Doc. 9-9, pp. 27, 35). Mr. Avery reported that his chest was feeling "somewhat better" on July 14, 2011. (Doc. 9-9, p. 31). Mr. Avery began testing negative for TB on August 15, 2011. (Doc. 9-9, p. 20). Over the course of his treatment, Mr. Avery gained 21 pounds. (Doc. 9-8, pp. 3, 11). Mr. Avery completed his TB treatment on July 16, 2012. (Doc. 9-9, p. 22). As noted, he was instructed to report to the health department to give sputum samples every three months after his treatment ended to check for active TB. (Doc. 9-9, p. 22). He had his last test on July 16, 2013. (Doc. 9-9, p. 22).

On June 25, 2014, Mr. Avery visited the health department to give a sputum sample because he had been in contact with someone with an active case of

pulmonary TB.  (Doc. 9-9, p. 21).  The culture results were negative for TB.  (Doc. 9-9, p. 18).  On February 1, 2016, Mr. Avery was called to the health department to give a sputum sample because he was suspected to have been exposed to a person with an active TB infection, whom had been his point of infection previously.  (Doc. 9-9, p. 21).  The culture results for that sample were negative.  (Doc. 9-9, p. 21).  On September 1, 2016, a nurse at the health department wrote a letter for Mr. Avery saying, "he has been evaluated and would have no restrictions [at] this time due to TB."  (Doc. 9-9, p. 21).

*Dr. Celten Robertson Evaluation*

Dr. Robertson performed an evaluation on Mr. Avery on January 26, 2018.  (Doc. 9-8, p. 139).  Dr. Robertson summarized the history of Mr. Avery's back pain.  (Doc. 9-8, p. 139).  He noted that Mr. Avery's back pain began in the 1970s after a sports-related injury that fractured a vertebra.  (Doc. 9-8, p. 139).  Mr. Avery had surgery to correct the issue.  (Doc. 9-8, p. 139).  The surgery helped, but Mr. Avery explained that the pain became worse over the years.  (Doc. 9-8, p. 139).  He rated his pain as 8/10 in severity.  (Doc. 9-8, p. 139).

Dr. Robertson noted that Mr. Avery "walks to the exam room with the help of a cane.  He can get on and off the exam table.  He is sitting with 8/10 back pain," but he appeared uncomfortable.  (Doc. 9-8, p. 140).  An assessment of Mr. Avery's gait showed that he "could not tolerate attempting to walk without the cane due to

fall risk," and he could not support his weight with his left leg.  (Doc. 9-8, p. 141).

Dr. Robertson wrote that Mr. Avery could not "toe-heel walk due to significant back

pain."  (Doc. 9-8, p. 141).  Dr. Robertson concluded that a cane was medically

necessary.  (Doc. 9-8, p. 141).  Dr. Robertson found that Mr. Avery had sciatica pain

at 30 degrees in both legs.  (Doc. 9-8, p. 142).  He found that Mr. Avery had normal

muscle strength in both arms and legs.  (Doc. 9-8, p. 142).

Dr. Robertson's Functional Assessment/Medical Source Statement indicated

that Mr. Avery had the following limitations:  a maximum standing or walking

capacity of less than two hours, a maximum sitting capacity of up to six hours, and

a maximum lifting capacity of less than five pounds, occasionally.  (Doc. 9-8, p.

143).

*Administrative Hearing*

Mr. Avery's administrative hearing took place on August 20, 2019.  (Doc. 9-

3, p. 31).  The ALJ questioned Mr. Avery.  Mr. Avery testified that he was 58, lived

with his mother, had two years of college, and had electrical technology training.

(Doc. 9-3, pp. 36, 40, 50).  Mr. Avery stated that he could not hold a full-time job

because he had problems with his back and his breathing.  (Doc. 9-3, p. 40).

Mr. Avery testified that he could not be around chemicals, dust, and extreme

temperatures because he had TB.  (Doc. 9-3, pp. 40-41).  He testified that he was

told that he would have problems with his lungs forever.  (Doc. 9-3, p. 41).  Mr.

Avery confirmed that he also had problems with moisture, fumes, odors, gases, and bad air.  (Doc. 9-3, pp. 41-42).   Mr. Avery testified that when he had worked previously, he would become short of breath and feel fatigued.  He stated he could not keep the pace on his job because he had to take a lot of breaks.  He testified that he was fired because he "couldn't keep up with it."  (Doc. 9-3, p. 47).

Mr. Avery testified that he was seeking treatment for his back pain at Riverview Medical and Quality of Life.  (Doc. 9-3, p. 43).  He stated he was told "[y]our're going to hurt the rest of your life" because his bones rubbed together at his fifth vertebrae.  (Doc. 9-3, p. 43).  Mr. Avery testified that the pain in his back was an "eight and nine, because [he] hurt[s] every day."  (Doc. 9-3, p. 43).  He explained that when he took his pain medication, his pain level was about six or seven.  (Doc. 9-3, p. 44).

Concerning his past work, the ALJ pointed out that Mr. Avery had worked through a staffing agency at CMAC Environmental Group, Koch Foods, and Wood Transportation.  (Doc. 9-3, p. 36).  Mr. Avery testified that he did light maintenance like emptying trash cans and cleaning offices for CMAC.  (Doc. 9-3, pp. 37-38).  Mr. Avery testified that he did not lift much for the CMAC other than five to ten-pound moss buckets.  (Doc. 9-3, p. 38).  Mr. Avery testified that he had to stand on a table and hang five to ten-pound chickens at Koch.  (Doc. 9-3, pp. 38-39).  He testified that his impairment was a result of the job he had with Koch because of the

stretching, bending, and standing for long periods of time. (Doc. 9-3, pp. 48-49). Mr. Avery stated that he worked as a janitor for Wood Transportation. (Doc. 9-3, p. 40).

Ms. Ward, a vocational expert, testified that Mr. Avery's past work as janitor and a poultry hanger were medium jobs. (Doc. 9-3, pp. 58-59). Ms. Ward determined that Mr. Avery performed those jobs at the light level. (Doc. 9-3, p. 59). Ms. Ward testified that Mr. Avery did not have transferable skills. (Doc. 9-3, p. 59). Ms. Ward concluded that a hypothetical person, with Mr. Avery's age, education, past work experience, and limitations who could perform medium work, could not return to his past work, (Doc. 9-3, p. 59), but she found that jobs existed within the national economy for an individual of Mr. Avery's ability, age, education, work experience, and RFC, (Doc 9-3, p. 60). Those jobs were linen room attendant and dining hall attendant. (Doc. 9-3, p. 60). "And a dining room attendant in this hypothetical, we're talking about a person, someone who cleans off the tables." (Doc. 9-3, p. 60).

## THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision. (Doc. 9-3, p. 8). The ALJ found that Mr. Avery had not engaged in substantial gainful activity since November 28, 2017, the application date. (Doc. 9-3, p. 13). The ALJ determined that Mr. Avery was suffering from the severe impairment of back

degenerative disc disease.  (Doc. 9-3, p. 13 (citing 20 CFR 416.971 *et seq.*)).  He also determined that Mr. Avery suffered from the non-severe impairments of hypertension, vision problems, shoulder problems, allergic rhinitis, bronchitis, depression, and bipolar disorder.  (Doc. 9-3, p. 13).  Based on a review of the medical evidence, the ALJ concluded that Mr. Avery did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1.  (Doc. 9-3, p. 14).  The ALJ determined that Mr. Avery had the RFC to perform:

> medium work as defined in 20 CFR 416.967(c) except frequent climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; frequent balancing, stooping, kneeling, crouching and crawling; frequent overhead reaching bilaterally; he must avoid concentrated exposure to vibrations, extreme temperatures, humidity, wetness, fumes, odors, dusts, gases and other pulmonary irritants; he must avoid all hazards such as open flames, unprotected heights and dangerous moving machinery.

(Doc. 9-3, p. 15).

Based on this RFC, the ALJ concluded that Mr. Avery could not perform his past relevant work as a janitor or poultry hanger as actually or generally performed. (Doc. 9-3, pp. 17-18).  Considering Mr. Avery's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Mr. Avery could perform, including linen room attendant (DOT 222.387-030) and dining room attendant (DOT 311.677-018).  (Doc. 9-3, pp. 18-19).  Accordingly, the ALJ determined that Mr. Avery was not under a disability, as

defined by the Social Security Act, since November 28, 2017, the date Mr. Avery filed his application.  (Doc. 9-3, p. 19).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc.  Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *The ALJ did not Perform a Complete Analysis at Step Three*

Mr. Avery challenges the ALJ's determination of his impairments at step two of the disability analysis.  (Doc. 13, p. 10).  Mr. Avery contends that the ALJ "erred in determining the claimant's tuberculosis [] to be non-severe."  (Doc. 13, pp. 9-10).  It would be more accurate to say that the ALJ did not identify tuberculosis as an impairment at all; in his opinion, the ALJ did not mention Mr. Avery's TB diagnosis, Mr. Avery's two active disease episodes, or the Alabama Department of Health's monitoring of Mr. Avery for TB.  The ALJ acknowledged only Mr. Avery's bronchitis diagnosis in 2019.  (Doc. 9-3, p. 13).

At step two, an ALJ must determine whether "the claimant has any severe impairment."  *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  "This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or

not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison*, 814 F.2d at 588.  Because the ALJ determined that Mr. Avery had one severe impairment – degenerative disc disease, the ALJ properly moved to step three of the disability analysis. *Jamison*, 814 F.2d at 588.

If there is error in the ALJ's omission of TB from Mr. Avery's list of severe and non-severe impairments, the error occurred at step three.  At step three, an ALJ must determine whether the applicant "has a severe impairment or a combination of impairments, whether severe or not, that qualify as a disability. The ALJ must consider the applicant's medical condition taken as a whole." *Jamison*, 814 F.2d at 588 (citing *Hudson v. Heckler*, 755 F.2d 781, 785 & n.2 (11th Cir. 1985), and *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).  In Mr. Avery's case, at step three, the ALJ considered only Mr. Avery's back impairment; the ALJ discussed no other impairment.  (Doc. 9-3, pp. 14-15).  The ALJ did not mention the non-severe impairments that he identified in his opinion, and he did not mention Mr. Avery's history of TB.  (Doc. 9-3, p. 13).

Tuberculosis is an infectious bacterial disease.  It usually affects the lungs, but it may impact "any part of the body such as the kidney, spine, and brain." https://www.cdc.gov/tb/topic/basics/default.htm (last visited March 7, 2022).  "TB bacteria can live in the body without making you sick. This is called latent TB

infection." https://www.cdc.gov/tb/topic/basics/tbinfectiondisease.htm (last visited March 7, 2022). "TB bacteria become active if the immune system can't stop them from growing. When TB bacteria are active (multiplying in your body), this is called TB disease." https://www.cdc.gov/tb/topic/basics/tbinfectiondisease.htm (last visited March 7, 2022). "Some people develop TB disease soon after becoming infected (within weeks) before their immune system can fight the TB bacteria. Other people may get sick years later when their immune system becomes weak for another reason." https://www.cdc.gov/tb/topic/basics/tbinfectiondisease.htm (last visited March 7, 2022). Symptoms of a person with TB disease include a bad cough that lasts three weeks or longer, weight loss, and fatigue. https://www.cdc.gov/tb/topic/basics/tbinfectiondisease.htm (last visited March 7, 2022). "A past history of pulmonary tuberculosis (TB) is a risk factor for long-term respiratory impairment.  Post-TB lung dysfunction often goes unrecognized, despite its relatively high prevalence and its association with reduced quality of life." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6019552 (last visited March 7, 2022). "[U]p to half of TB survivors have some form of persistent pulmonary dysfunction despite microbiologic cure.  Pulmonary dysfunction, ranging from minor abnormalities to severe breathlessness, can increase the risk of death from respiratory causes." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6019552 (last visited March 7, 2022) (footnotes omitted).

In support of his SSI application, Mr. Avery provided medical records that demonstrate that he received treatment for active TB disease from 2011 to 2012. (Doc. 9-9, pp. 22-33).  Mr. Avery returned to the Etowah County Department of health in 2013, 2014, and 2016 for TB tests because he had been exposed to an individual with TB disease.  (Doc. 9-9, pp. 18, 21).  Mr. Avery's tests were negative. (Doc. 9-9, p. 21).  At the administrative hearing, when the ALJ asked Mr. Avery about his lungs, Mr. Avery replied that he had had tuberculosis, "and I'm still suffering from it."  (Doc. 9-3, p. 41).  Mr. Avery acknowledged that he did not have an active infection, but he testified that the Alabama Department of Health told him that he would have "difficulty with [his] lungs forever," and he stated that he had recently completed a 30-day treatment with an inhaler.  (Doc. 9-3, p. 41).  Mr. Avery's medical records confirm his testimony about his prescribed use of an inhaler in 2019 after he was hospitalized for bronchitis.  (Doc. 9-8, p. 176).  Mr. Avery testified that he had had breathing problems since his first TB episode.  He stated that, when he worked, he experienced shortness of breath and fatigue, and he had problems with heat, cold, moisture, fumes, odors, dust, gases, and bad air.  (Doc. 9-3, pp. 41-42, 47).  Mr. Avery contends that he had to take a lot of breaks in his previous job, which caused him to be fired.  (Doc. 9-3, p. 47).[6]

---

[6] At the administrative hearing, when asked by the ALJ what year he was diagnosed with TB, Mr. Avery testified that it was in 2018.  (Doc. 9-3, pp. 42-43).  Mr. Avery's attorney asked about the year of his diagnosis, stating, "I want to go back to the question about TB okay? Now you said

The Commissioner argues that the ALJ did not have to list TB as an impairment because, "while [Mr. Avery] had a history of TB," Mr. Avery failed to demonstrate that TB was a medically determinable impairment during the relevant period, from the month of his application in 2017 through the date of the ALJ's decision in 2019.  (Doc. 14, p. 6).  The Commissioner asserts that "during the relevant period," Mr. Avery "routinely denied fatigue and respiratory symptoms to providers except for the occasion when he had bronchitis."  (Doc. 14, p. 9).

There is more information in Mr. Avery's medical records than the Commissioner suggests.  True, the medical records that document Mr. Avery's diagnosis with and treatment for TB disease do not fall within the period relevant to Mr. Avery's SSI application.  *See* 20 C.F.R. §§ 416.202-03.  But Mr. Avery's medical records over the months immediately preceding his SSI application and during the application period contain evidence of periods of persistent cough.  Mr. Avery complained of a cough when he visited Quality of Life in April of 2016.  (Doc. 9-8, p. 87).  When he visited Quality of Life in September of 2016, he complained about a persistent, non-productive cough.  Mr. Avery stated that nothing relieved his cough.  (Doc. 9-8, p. 98).  Nurse Rogers noted that Mr. Avery had been cleared of

---

you had it in 2018, but you were diagnosed with it, was it not 2005?"  Mr. Avery did not agree.  Mr. Avery stated that it had been more recent than 2005.  Mr. Avery's attorney pointed out that Mr. Avery's medical records reflect a diagnosis in 2005 while in Kilby prison, and a diagnosis and treatment with the health department from 2005 to 2016.  (Doc. 9-3, p. 46).  The administrative record does not reflect a TB diagnosis in 2018.

TB by the health department and had no active disease.  (Doc. 9-8, pp. 98, 104).

Nurse Rogers diagnosed Mr. Avery with a recurrent cough and prescribed Tessalon

Perles to treat it.  (Doc. 9-8, pp. 104-05).[7]  In November of 2018, Mr. Avery visited

Quality of Life for, among other things, cold symptoms.  (Doc. 9-8, p. 168).  He

reported that he had a non-productive, persistent cough that had started a week

before.  (Doc. 9-8, p. 168).  He indicated that nothing relieved the cough.  (Doc. 9-

8, p. 168).  He reported fatigue.  (Doc. 9-8, p. 171).  Nurse Rogers told Mr. Avery

to take Claritin and to use Benadryl at night, and Nurse Rogers encouraged Mr.

Avery to exercise.  (Doc. 9-8, p. 173).  When Mr. Avery visited Quality of Life on

February 11, 2019 after he had been hospitalized for bronchitis in mid-January, he

complained of wheezing, hoarseness, and sore throat.  (Doc. 9-8, pp. 176, 180).

Nurse Rogers instructed Mr. Avery to continue to use his inhaler.  (Doc. 9-8, p. 181).

In the ALJ's opinion, the entire discussion of Mr. Avery's respiratory issues consists

of this:  "On February 11, 2019, the claimant returned to Quality of Life . . . he had

bronchitis."  (Doc. 9-8, p. 16).

As in *Jamison*, the Court is "unable from the ALJ's opinion in this case to

determine if at any step in his sequential analysis he considered the claimant's entire

medical condition."  814 F.2d at 588.  The Commissioner argues that any error at

---

[7] "Tessalon Perles is a non-narcotic cough medicine that numbs the throat and lungs, making the
cough reflex less active."  https://www.drugs.com/mtm/tessalon-perles.html (last visited March 7,
2022).

step two, and presumably step three, is harmless because the ALJ gave Mr. Avery the benefit of the doubt and included respiratory limitations in Mr. Avery's RFC. (Doc. 14, p. 8).   Indeed, in developing Mr. Avery's RFC, the ALJ included limitations relating to respiratory irritants: "he must avoid concentrated exposure to vibrations, extreme temperatures, humidity, wetness, fumes, odors, dusts, gases and other pulmonary irritants." (Doc. 9-3).  But these limitations seem premised on Mr. Avery's 2019 hospitalization for bronchitis.  Nothing in the record suggests that the ALJ recognized, much less considered, Mr. Avery's medical records containing longitudinal evidence of respiratory problems or Mr. Avery's testimony concerning the resulting exertional limitations, individually or in combination with Mr. Avery's other impairments.  There is no indication that the ALJ included in his analysis Mr. Avery's history of TB disease or the possible lingering effects of Mr. Avery's periods of active disease, effects which often go "unrecognized, despite [their] relatively high prevalence and [] association with reduced quality of life." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6019552 (last visited March 7, 2022).

"Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational.'" *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)); *see also Simon v. Commissioner*, 7 F.4th 1094, 1104-05 (11th Cir. 2021) ("It is the responsibility of the agency, not the reviewing court, to supply the justification for its decision and to sufficiently explain 'the weight [it] has given to obviously probative exhibits.'") (quoting *Cowart*, 662 F.2d at 731)).   Therefore, the Court is not persuaded that the error at step three is harmless.  This error alone warrants remand for additional proceedings.

> *On Remand, the ALJ Should Reconsider His Finding that Mr. Avery Can Perform Medium Work.*

Mr. Avery argues that the ALJ's selection of a medium work RFC is error. Mr. Avery contends that "[s]ubstantial evidence might possibly support a finding that an individual experiencing such chronic [back] pain can perform sedentary or light work, but not medium work." (Doc. 13, p. 13).  Mr. Avery points out that medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 416.967(c)." (Doc. 13, p. 13).  Mr. Avery writes:  "Here we have a claimant who was 58 years old on his hearing date," who "stands just 5'1" tall and weighs less than 110 pounds.  The 50 pound lifting requirement for medium work would require Mr. Avery to lift almost one-half of his own weight!"  (Doc. 13, p. 13).  Mr. Avery asserts that an individual who is older than 55 and limited to light weight is presumptively disabled under Grid Rule 202.04.  (Doc. 13, p. 13) (citing 20 C.F.R. § 416.967(c)); *see*

*Brightmon v. Soc. Sec. Admin., Comm'r*, 743 Fed. Appx. 347, 352 (11th Cir. 2018) ("As relevant here, the grids direct a finding of not disabled for an individual closely approaching retirement age (aged 60 or older) who is limited to medium work, has a high-school education, and lacks previous or skilled work experience. 20 C.F.R. pt. 404, subpt. P, app. 2 § 203.06. The same individual who is limited to light work instead of medium work, however, is disabled.").

As discussed, an ALJ determines a claimant's RFC at step four of the sequential analysis. To make the determination, an ALJ must "consider[] all relevant medical evidence and other evidence." *Brightmon*, 743 Fed. Appx. 347, 351-52 (11th Cir. 2018). "Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)." *Brightmon*, 743 Fed. Appx. at 352. In *Brightmon*, to provide a clearer picture of the demands of medium work, the Eleventh Circuit turned to SSR 83-10 and explained:

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) ... In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

> SSR 83-10, *available at* 1983 WL 31251.

*Brightmon*, 743 Fed. Appx. at 352.  In *Brightmon*, the Eleventh Circuit concluded that substantial evidence in the record in that case did not support the ALJ's finding that Mr. Brightmon, who was 59 at the alleged onset date and 62 at the time of his administrative hearing, had the RFC to perform medium work.  *Brightmon*, 743 Fed. Appx. at 348, 354.

Here, if the Court were to fully undertake an analysis of the ALJ's RFC determination, a task that the Court should not perform until the step three analysis is updated, the Court would consider the fact that the ALJ did not consider all of Mr. Avery's non-severe impairments when determining Mr. Avery's RFC.  *See Delgado v. Commissioner*, 2021 WL 4099237, *6 (11th Cir. Sept. 9, 2021) ("There is no indication that the ALJ considered the combined effect of Delgado's multiple impairments when assessing his subjective complaints. For example, the ALJ does not address whether Delgado's depression and anxiety might exacerbate his physical impairments. We cannot therefore say the ALJ provided sufficient reasoning for determining that the proper legal analysis has been conducted here.") (internal marks omitted).  The Court also would consider the fact that one of the two available jobs the VE suggested, dining room attendant, would require Mr. Avery to "clean[] off the tables" throughout an 8-hour workday.  (Doc. 9-3, p. 60).

The ALJ found that Mr. Avery had "a greater sustained capacity than he alleges," and the ALJ noted that Mr. Avery could read up to five hours weekly and

walk or cycle for 10 to 15 hours per week.  (Doc. 9-3, pp. 16-17).  The Court infers that the evidence concerning Mr. Avery's reading indicated to the ALJ that if Mr. Avery could concentrate sufficiently to read for, on average, one hour per workday, then he could remain on task for an 8-hour workday.   Similarly, the Court extrapolates from the ALJ's statement concerning Mr. Avery's exercise that the ALJ concluded that if Mr. Avery could walk, on average, two hours per day, then he could be on his feet most of an 8-hour workday and frequently bend at the waist to clean tables.  *Brightmon* may counsel differently.

## CONCLUSION

For the reasons discussed above, the Court remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 8, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE